IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| PAMELA BOND, | |
| Plaintiff | JURY TRIAL DEMANDED |
| v. | |
| SIG SAUER, INC., | |
| Defendant | |

COMPLAINT AND JURY DEMAND

### I. INTRODUCTION

During her employment as a tumbler operator with Sig Sauer, Inc., Plaintiff Pamela Bond was subjected to egregious sexual harassment by her supervisor, Norman Perrone.  By way of example, Mr. Perrone threatened to strap Ms. Bond to a gun part tumbler so that he could watch her "titties and ass shake."  Ms. Bond and a co-worker repeatedly reported Mr. Perrone's severe and pevasisve harassment to Sig Sauer Human Resources officials and other executives, but the officials took <u>no</u> action to remediate the harassment.  Instead, the officials took adverse action against Ms. Bond themselves, and stood by as Mr. Perrone's behavior escalated in relation for Ms. Bond reporting his abuses.

### II. PARTIES

1.  The Plaintiff, Pamela Bond, is resident of Epping, New Hamsphire.

1

2. The Defendant, Sig Sauer, Inc., is a Delaware corporation, registered as a foreign corporation with the State of New Hampshire, and it has a principal place of business in Newington, New Hampshire.

3. At all times relevant to the allegations in this complaint, Ms. Bond was employed by the Defendant, Sig Sauer, Inc.

4. The Defendant, Sig Sauer, Inc., currently employs, and at all times relevant to this complaint has employed, more than 15 fulltime employees.

### III.   JURISDICTION AND VENUE

5. This Court has jurisdiction over the Plaintiff's Title VII claims, pursuant to 28 U.S.C. § 1331, providing for district court, original jurisdiction, over civil actions arising from the laws of the United States.

6. The Court has supplemental jurisdiction over the Plaintiff's RSA 354-A claims pursuant to 28 U.S.C. § 1367, as Plaintiff's RSA 354-A claim are a part of the same case and controversy as the Plaintiff's Title VII claims.

7. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. §1391(b)(1) and (2) where the Defendant has a principal place of business in New Hampshire and the Plaintiff's injuries occurred in New Hampshire.

### IV.   STATEMENT OF FACTS

8. In September 2014, Plaintiff, Pamela Bond, was hired to work as a temporary employee for Sig Sauer, Inc., a firearms manufacturer.

9.      Owing to the quality of her work, in December 2014, Ms. Bond was offered, and she accepted, the position of permanent, full-time tumbler operator in Sig Sauer's firearms Finishing Department.

10.      Early in her employment, Ms. Bond was taunted sexually by her co-worker. For example, the co-worker fired an air gun into her buttocks as she bent over to pick up her coat.

11.      Ms. Bond complained to her supervisor, Norman Perrone, that the conduct was unacceptable.

12.      Though Mr. Perrone represented that he would address the conduct with the co-worker, Mr. Perrone failed to do so, and he also failed to report the conduct to Sig Sauer Human Resources in compliance with Sig Sauer policy.

13.      In the spring of 2015, Mr. Perrone too began to sexually taunt Ms. Bond.

14.      At first the comments were passive; on Easter, he sought out Ms. Bond to tell her that he was going home to play "hide the carrot" with his wife while "grab[bing] her bunny ears."

15.      Ms. Bond objected to the comments, telling Mr. Perrone politely that she found them to be offensive and to stop making the comments.

16.      Gradually, Mr. Perrone's comments became more personal and aggressive. In May 2015, Mr. Perrone told Ms. Bond that he "like[d] the view" when she bent over her tumbler to clean the troth out.

17.   In June 2015, Mr. Perrone told Ms. Bond that he could "take care of" her with his "10 inch cock."

18.   In July 2015, Mr. Perrone repeatedly commented to Ms. Bond's male co-worker (such that Ms. Bond could hear) that she had a "pregnant ass."

19.   On a different occasion in July 2015, Mr. Perrone asked Ms. Bond to jump up on tumbler and dance.

20.   Later in July 2015, Mr. Perrone exclaimed to Ms. Bond that he was going to "strap [her] to the tumbler so that he could watch her titties and ass shake."

21.   In August or early September 2015, Mr. Perrone dropped gun parts on the floor and told Ms. Bond "bitch, pick that up."

22.   In October 2015, Mr. Perrone told Ms. Bond to come closer so that he could "slap her ass."

23.   Throughout this period, in response to Mr. Perrone's behavior, Ms. Bond respectfully admonished Mr. Perrone, telling him, albeit with increasing forcefulness, to the effect of "please do not speak to me in that way."

24.   Mr. Perrone became increasingly angry when Ms. Bond objected to his behavior, and he began to openly threaten to fire Ms. Bond.

25.   As of the fall of 2015, Mr. Perrone additionally decreased Ms. Bond's work hours, causing her a loss in income.

26. Mr. Perrone simultaneously increased performance and productivity demands for Ms. Bond, and he changed her work assignment such that she was forced to work with heavier materials.

27. Emotionally distraught over Mr. Perrone's mistreatment, Ms Bond confided in her co-worker, Quality Control Inspector, Hadley Reid.

28. Ms. Reid witnessed Mr. Perrone's offensive behavior and also witnessed the unwarranted actions taken against Ms. Bond, including the reduction in work hours and increased work demands.

29. Ms. Reid reported Mr. Perrone's offensive sexual and adverse actions taken against Ms. Bond to Sig Sauer Human Resources Manager, Renet Dion.

30. Ms. Dion dismissed Ms. Reid and her report, telling Ms. Reid that she could not take the report because Ms. Reid was not yet a permanent employee of Sig Sauer. This occurred despite that Sig Sauer's sexual harassment policy invited reports from anyone who witnessed harassment.

31. In December 2015, *Ms. Bond* reported Mr. Perrone's sexually offensive and adverse actions directed at her to Mr. Perrone's Departmental supervisor, Gordon Packer.

32. Mr. Packer promised to address the conduct but took no actual action to help Ms. Bond.

33. Rather, Mr. Packer contacted Mr. Perrone to tell him what Ms. Bond had reported and he and Mr. Perrone laughed about Ms. Bond and her complaints.

5

34. Ms. Reid overheard Mr. Packer and Mr. Perrone laughing about Ms Bond and she reported the conversation to *Mr. Packer's* supervisor, Director of Machining and Quality, Phil Hinckley, as well as what she had witnessed regarding Mr. Perrone's offensive and adverse actions against Ms. Bond.

35. Mr. Hinckley took no responsive action to Ms. Reid's report other than to inform Mr. Perrone of what Ms. Reid had reported to him.

36. Mr. Perrone bitterly snapped at Ms. Reid for "throwing him under the bus."

37. In January 2016, having received no relief via her report to Mr. Packer, Ms. Bond reported Mr. Perrone's sexually offensive and adverse actions directed at her to Renet Dion.

38. Ms. Bond identified several witnesses to Mr. Perrone's conduct, including Ms. Reid, but Ms. Dion failed to interview these witnesses.

39. Instead, approximately a week after Ms. Bond's report to her, Ms Dion allowed *Mr. Perrone* to conduct Ms. Bond's 2015 performance review.

40. Ms. Dion further permitted Mr. Perrone to give Ms. Bond a poor score in the category of "Attitude" and to advise Ms. Bond that she had been "negative" in not accepting direction from her supervisor.

41. Ms. Dion further, on January 19, 2016, issued Ms. Bond a letter advising that no action needed to be taken against Mr. Perrone in response to her sexual harassment report, because, in her view, Mr. Perrone's behavior had "gotten better."

42. The same letter remarkably warned *Ms. Bond,* that *she* must be mindful of comporting with Sig Sauer standards of conduct.

43. Upon information and belief, Ms. Dion took no action against Mr. Perrone and instead took adverse action against Ms. Bond because Ms. Dion has a close personal relationship with Mr. Perrone.

44. After learning of Ms. Bond's report to Human Resources of sexual harassment, Mr. Perrone stated, in the presence of Ms. Reid, that he was "going to get rid of that bitch," referring to Ms. Bond.

45. Ms. Reid reported this threat to Patti Buonopane, Sig Sauer Human Resources representative, who, like Ms. Dion, took no action in response to Ms. Reid's report.

46. Meanwhile, Mr. Perrone became highly abusive in his conduct toward Ms. Bond. He frequently scrutinized her work (without cause) and yelled at her and humiliated her in front of her co-workers.

47. Mr. Perrone further instructed Ms. Bond's co-workers, who had had been instructed to work as a team, to not interact with her or assist her with her work.

48. On or about March 1, 2016, Ms. Bond appealed to Mr. Perrone, asking him to assign a co-worker to help her unload a tumbler, because she was suffering from shoulder pain and her tumbler had been overloaded at Mr. Perrone's direction.

49. Mr. Perrone told Ms. Bond to conscript a co-worker with whom he was friends.

50. Predictably, when Ms. Bond asked the co-worker for assistance, the co-worker vigorously objected to helping Ms. Bond.

7

51.     The co-worker began screaming at Ms. Bond, who loudly responded in defense of herself.

52.     Approximately fifteen minutes after the argument subsided; a security officer removed only Ms. Bond from the Finishing Department floor, bringing her to a meeting with Gordon Packer and Patti Buonopane.

53.     Mr. Packer and Ms. Buonopane, with awareness of multiple reports that Ms. Bond was being harassed by Mr. Perrone, and awareness that no remedial action had been taken in response to these reports, charged Ms. Bond with disrupting the workplace and sent her home from work.

54.     Ms. Bond attempted to explain that Mr. Perrone's conduct had become increasingly more hostile in the months following her sexual harassment complaint, resulting in her isolation and the argument with her co-worker, but neither official would credit her explanation.

55.      The next day, while Ms. Bond remained absent from work because she was extremely distressed over her mistreatment at work, culminating in her humiliating removal from work, Ms. Reid <u>again reported</u>, to Ms. Buonopane, that Mr. Perrone had threatened and was planning to "get rid of" Ms. Bond, "that bitch."

56.     Ms. Reid strongly asserted to Ms. Buonopane that Mr. Perrone was retaliating against Ms. Bond for reporting to Human Resources that he had sexually harassed her.

57.     On March 3, 2016, Ms. Bond returned to work to be told that she was being transferred from her position in the Finishing Department, a creative position in which

she took great pride, to the Shipping Department, wherein her duties would be limited to repetitively checking that boxes had been packed properly.

58. Patti Buonopane issued Ms. Bond a final warning letter commensurate with the transfer, citing Ms. Bond's "disruptive" behavior.

59. Mr. Perrone remained employed in the Finishing Department with no disciplinary action taken against him.

60. Ms. Bond was left severely emotionally injured by, not only Mr. Perrone's conduct, but the conduct of Sig Sauer officials, who knew of, but ignored and even added to Mr. Perrone's abuses.

61. Ms. Bond timely filed a Charge of Discrimination with the New Hampshire Commission for Human Rights and the EEOC, claiming unlawful sex discrimination and retaliation in violation of Title VII and NH RSA 354-A.

62. On August 3, 2018, Ms. Bond was issued a Notice of Right to Sue permitting her to the file this complaint.

**V.     CAUSES OF ACTION**

    **A.     Sexually Hostile Work Environment in Violation of Title VII and NH RSA 354-A.**

63. The foregoing allegations are re-alleged and incorporated herein.

64. Hostile environment harassment, in violation of 42 U.S.C. 2000e-2 and RSA 354-A:7, consists of offensive gender-based conduct that is severe or pervasive enough to create an objectively hostile or abusive work environment and which is also subjectively

perceived to be abusive by the victim. See Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir.1996).

65. An employer becomes liable for its hostile work environment where there is actual knowledge by the employer, or high-echelon officials of an employer organization, of sufficiently sexually harassing action by subordinates, which the employer or its informed officers do nothing to stop. See Faragher v. City of Boca Raton, 524 US 725, 789 (1998).

66. Mr. Perrone's sex-based conduct, including repeated references to Ms. Bond as his "bitch" and Ms. Bond's "ass" and "titties," and repeated sexual threats to Ms. Bond, e.g. to "take care of her" with his "10 inch cock, to "strap [Ms. Bond] to a tumbler" and to "slap her" for his sexual pleasure, was objectively offensive, severe and pervasive and Ms. Bond experienced this conduct as abusive.

67. Sig Sauer officials, to include Phil Hinckley, Gordon Packer, Renet Dion, and Patti Buonopane, all knew of the hostile environment created by Mr. Perrone but did nothing to stop it and, in fact, intimidated and punished his victim, *Ms. Bond*, rendering the employer, Sig Sauer, liable for the hostile work environment.

68. Liability also lies strictly against the employer when its supervisory employee has created a hostile work environment and the harassment involves "tangible employment action." See id.

69. A "tangible action" or "adverse employment action" involves a discrete change in the terms and conditions of employment. See Noviello v. City of Boston, 398 F.3d 76, 88 (1st. Cir. 2005).

70. Tangible actions may include demotion, economic injury to an employee, and reassignment to an undesirable position, even if the reassignment is not accompanied by decrease in pay.  See Faragher, 524 U.S. at 807 (citing "undesirable reassignment" as a "tangible action"); see Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 760 (1998)(defining "tangible action" as when "the plaintiff can show that she suffered an economic injury from her supervisor's actions"); see Mead v. Fairpoint Communications, Inc., 2017 DNH 204 (Mead 1)(reasoning that reassignment to a position that "pales in comparison" to the former position, although of the same rank and pay, nevertheless constitutes a demotion for the purpose of analyzing constructive discharge).

71. As part of the hostile work environment imposed on Ms. Bond, she sufferred tangible, adverse actions including: a reduction in work hours and pay; an increase in work duties and performance requirements; and an undesireable, humiliating transfer to a lesser position.

72. The hostile work environment endured by Ms. Bond, including the adverse actions suffered, caused Ms. Bond significant economic and emotional losses for which Sig Sauer is liable.

    **B.    Retaliation in Violation of Title VII and NH RSA 354-A.**

73. The foregoing allegations are re-alleged and incorporated herein.

74. To engage the gears of Title VII and RSA 354-A anti-retaliation provisions, a plaintiff must show that she (i) undertook protected conduct, (ii) suffered an adverse employment action, and (iii) the two were causally linked.  See Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005).

75. A hostile work environment which is "known by and tolerated by the employer" is cognizable as a retaliatory "adverse employment action" for the purpose of satisfying the second element of the prima facie test for retaliation under Title VII and RSA 354-A:19. See id.

76. In this case: Mr. Perrone engaged in sexual harassment; Ms. Bond and a co-worker reported the harassment; Mr. Perrone announced that he intended to "get rid of that bitch"; Mr. Perrone's conduct became more hostile and abusive *after* Ms. Bond's and her co-worker's reports of harassment; Ms. Bond and the co-worker reported Mr. Perrone's *increased hostility* to Sig Sauer officials, including Mr. Perrone's expressed intention to "get rid of" Ms. Bond; and Sig Sauer officials not only tolerated Mr. Perrone's conduct but took adverse actions against Ms. Bond themselves, in the form of removal from work, disciplinary action, and undesireable reassignment, close in time after receiving the reports of Mr. Perrone's harassment.

77. Sig Sauer officials were aware of Mr. Perrone's retaliatiory harassment and intention to get rid of Ms. Bond, they did nothing to stop it, and within days of her reporting activity took adverse action against Ms. Bond themselves, further demonstrating the causal relationship between Ms. Bond's reporting activity and the adverse actions she suffered.

78. The retaliation directed at Ms. Bond by Mr. Perrone and Sig Officials has caused Ms. Bond economic and emotional losses for which Sig Sauer is liable.

WHEREFORE, Pamela Bond respectfully requests that this honorable court:

    A.    Schedule this matter for trial by jury, and, after trial:

    B.    Award the Plaintiff damages for lost back wages;

    C.    Award the Plaintiff damages for all other economic losses caused by the defendant's violations of law;

    D.    Award punitive damages;

    E.    Award damages for the Plaintiff's emotional distress, pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

    F.    Award enhanced compensatory damages;

    G.    Award attorney's fees;

    H.    Award interest;

    I.    Award the Plaintiff damages for all other damages to which she is entitled under applicable law; and

    J.    Grant such other and further relief as is just and equitable.

    Respectfully submitted,

    PAMELA BOND

    By her attorneys,

    DOUGLAS, LEONARD & GARVEY, P.C.

Date: September 1, 2018    By: /s/ Megan Douglass

    Megan Douglass, Esq. NH Bar #19501
    14 South Street, Suite 5
    Concord, NH 03301-5321
    (603) 224-1988
    mdouglass@nhlawoffice.com